Harry G. Herman, S.
Three questions have arisen relative to the judicial settlement of the account of the executors: (1) the validity of the bequest in paragraph “seventh” of the will which reads “ (b) To epiphany mission, now of Sherwood, Tennessee, the sum of one thousand dollars ($1,000.00) ”, (2) the validity of the claim of the Rector, Churchwardens and Vestrymen of Grace Church of White Plains upon a pledge made by the decedent and (3) the fixation of attorneys’ fees.
The Epiphany Mission of Sherwood, Tennessee is an unincorporated religious society. It is affiliated with the Episcopal Diocese of Tennessee. The Mission currently has a parsonage upon land that it owns and is in the process of constructing a new church building.
It is a well-established rule of this State that an unincorporated association is not capable of receiving a bequest (Mount v. Tuttle, 183 N. Y. 358; Matter of Merritt, 280 N. Y. 391; Matter of Macaulay, 173 Misc. 887). However, in determining the validity of the bequest of personal property to a nonresident legatee, the law of the domicile of the recipient governs (Hope v. Brewer, 136 N. Y. 126; Matter of Gault, 48 N. Y. S. 2d 928; Matter of Idem, 256 App. Div. 124; Matter of Macaulay, supra). An examination must therefore be made of the Tennessee law.
The applicable statute is section 64-203 of the 1956 Code of Tennessee hereinafter quoted: * ‘ Ownership of land by religious societies.— Any religious denomination, religious society, or church, whether incorporated or not, may take, by deed or otherwise, and hold any amount of acreage at one place for purposes of public worship, or for a parsonage, or for a burial ground.”
While research has failed to discover any decisions interpreting the aforesaid statutory provision, there are two fairly recent decisions worthy of note which dealt with section 4407 of the 1932 Code of Tennessee. The latter statute differs from the earlier provision only in the respect that authority is now provided for holding “ any amount of acreage ” whereas, the earlier statute enabled the holding by a religious society of ‘1 not exceeding five (5) acres of land ”.
The Supreme Court of Tennessee in Sales v. Southern Trust Co. (182 Tenn. 270) sustained a gift of personalty to the trustees of the First Baptist Church of Clarksville, Tennessee. The earlier statute was interpreted as enabling unincorporated religious societies to take gifts of personalty and using the same to improve and maintain their realty which they are specifically authorized to hold by statute. This decision was expressly followed five years later in 1950 in Nashville Trust Co. v. Johnson (34 Tenn. App. 197). It is observed that the *192 authority of Rhodes v. Rhodes (83 Tenn. 637) relied upon by the executors as authority to deny payment of the gift, was examined by the court in Sales v. Southern Trust Co. (supra). A distinction was made between outright gifts of personalty and trusts (p. 279): “In that case [Rhodes v. Rhodes] it was held that these unincorporated religious societies could not take a gift of bonds, the interest on which was to be applied to the churches ‘ as fast as due This gift could by no means be construed as a gift of money necessary for upkeep of church houses. It was a gift of bonds to be held by the churches as investments, to be held permanently, with the right on the part of the churches to use the interest only but to use the interest in any way. Clearly our statutes give unincorporated religious societies no authority to take and hold personalty on such terms, no power to act as a trustee.”
The court is satisfied that under the law of Tennessee the legatee named by the testatrix is entitled to receive its legacy. Payment thereof will be directed to the trustees of the Epiphany Mission of Sherwood, Tennessee.
Decedent in 1959 made a pledge of $1,800 payable in 1960, “ for the work of my Church in parish, diocese, nation and world ”. However decedent passed away having only paid $600 of the said pledge. The court is asked to approve the claim of the Rector, Churchwardens and Vestrymen of Grace Church in the sum of $1,200, the balance due under the pledge. The record discloses that decedent had been a member of the congregation for some 55 to 60 years. The previous year she had contributed $1,725 to the church.
The decisions of the courts in this State in recent years indicate a trend favoring the enforcement of charitable subscriptions. (Liberty Maimonides Hosp. v. Felberg, 4 Misc 2d 291.) The court in Matter of Lord (175 Misc. 921, 923) stated: “ Since however, dictates of public advantage were almost invariably involved in transactions of this variety, defenses of want of consideration were customarily viewed with disfavor (Barnes v. Perine, 12 N. Y. 18, 24; Allegheny College v. National Chautauqua County Bank, supra [246 N. Y. 369, 374]), with the result that the usual tendency of the courts was to attempt, on some more or less plausible theory, to sustain such agreements with at least a modicum of lip service to the usually applicable principles of contracts ”. The feeling that a promise of this nature ought to be enforced has influenced the courts to declare for honesty, fair dealing and equity (First Methodist Episcopal Church of Mount Vernon v. Estate of Howard, 133 Misc. 723).
The courts from time to time have advanced three theories to sustain charitable subscriptions (Matter of Lord, supra). *193 The theory of the consummation of a bilateral contract was espoused in Allegheny Coll. v. National Chautauqua County Bank of Jamestown (supra) saying that a bilateral agreement may exist though one of the mutual promises be a promise implied in fact, an inference from conduct as opposed to an inference from words. Another theory is the application of the equitable principle of estoppel (Matter of Taylor, 251 N. Y. 257). In this connection the court said in I. & I. Holding Corp. v. Gainsburg (276 N. Y. 427, 434): “ That doctrine [estoppel] need not be applied to save a subscription where a request or invitation that the promisee go on with its work can be implied from the subscription agreement. It is only when a request or an invitation to carry on cannot be implied in fact that it is necessary to invoke that doctrine ”.
The remaining theory was emphasized also in I. & I. Holding Corp. v. Gainsburg (supra, p. 431) wherein the subscription agreement provided that it was given “ To aid and assist ” the charity “in its humanitarian work”. Upon the faith of the subscription the charity “ proceeded in its humanitarian work ” and incurred liabilities. In sustaining the enforcibility of the agreement the court stated (p. 433): “ Our courts have definitely ruled that such subscriptions are enforceable on the ground that they constitute an offer of a unilateral contract which, when accepted by the charity by incurring liability in reliance thereon, becomes a binding obligation ”.
Here it is reasonable to say that upon the basis of the pledge of this decedent, as well as the other members of the congregation, the church established a budget and necessarily incurred various obligations. In reliance upon the expectation of the receipt of moneys derived from such pledges and from outright contributions, the church commits itself and plans its future operations. The claim is sustained.